# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 7, 2016 Session

## STATE OF TENNESSEE v. CHRISTOPHER JONES

**Appeal from the Criminal Court for Shelby County**
**No. 13-06162    J. Robert Carter, Jr., Judge**

---

**No. W2015-01028-CCA-R3-CD  -  Filed January 17, 2017**

---

The defendant, Christopher Jones, was convicted of the first degree premeditated murder of his estranged wife, Heather Palumbo-Jones, and the abuse of her corpse, for which he was sentenced, respectively, to life imprisonment and two years to be served concurrently. On appeal, he argues that the trial court erred by allowing statements made by his wife as an exception to the hearsay rule, by allowing evidence of his prior abuse of the victim, and by admitting into evidence photographs of his wife's charred body. Additionally, he argues that the evidence is insufficient to sustain his conviction for first degree murder. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Stephen C. Bush, District Public Defender; Harry E. Sayle, III (on appeal), Kindle E. Nance and Robert C. Felkner (at trial), Assistant Public Defenders, for the appellant, Christopher Jones.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Theresa S. McCusker, Carla L. Taylor, and Danielle M. McCollum, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

At the time of her disappearance on April 16, 2013, the victim, Heather Palumbo-

Jones, and the defendant had been married for over eight years and had two children. They had been separated since January 1, 2013, and had ongoing disputes as to custody of their children. Germantown police officers contacted the defendant shortly after the victim failed to show up at her employment at Frayser Achievement Elementary School. As officers questioned him again on April 23, 2013, a cadaver dog, which they had released by his vehicle, detected the smell of a dead body. The defendant then told the officers that he and the victim had been arguing, she fell and hit her head, and he transported and burned her body, later burying it at a location he led them to in rural Shelby County. Subsequently, he told officers that, actually, he found her dead body after she had hung herself.

At the trial, Diane Perry, the State's first witness, testified that she was the victim's cousin. She said that they had lived together when both were students at the University of Memphis. During that time in 2000, the victim met the defendant, who was about ten years older; and he moved into the apartment with them. His living there was "contentious," and Ms. Perry gave an ultimatum that either he, or the two of them, would have to move from the apartment. The two moved out in March of that year. Ms. Perry learned from the victim in April 2004 that she was pregnant with the defendant's child, and they were married in August of that year. Ms. Perry and the victim then renewed their friendship. The victim worked full-time while attending college and took about ten years to obtain her bachelor's degree. She said that, during this period, the defendant "never established a career." The victim talked with her several times about leaving the defendant because of "infidelity in the marriage or things like that." During this time, the victim gained 150 pounds and became obese. However, following her graduation from college, the victim began to exercise and there was "a huge change" in her. In 2012, she helped the victim plan to leave the defendant, but their minister began counseling them, and the victim did not leave.

Some of the victim and defendant's marriage problems were caused by the defendant's not following through on jobs he had talked about getting. In the summer of 2012, the victim "did some safety things," changing her bank account and preparing to leave the defendant. On the following New Year's Day, she moved to another house, and Ms. Perry talked to her "daily." The victim told her that "she was very fearful of [the defendant], but she was . . . so happy." The victim further told her that the defendant knew where she lived, was coming and seeing her, was surprised and "very angry" because she had left; and the victim "was very scared for her safety." Following her move, the victim filed for divorce from the defendant.

As for their children, the victim and the defendant had a split-custody arrangement, by which their son would live with the defendant and their daughter would live with the victim. However, because of the victim's work hours, she dropped off their

daughter, who was autistic, at the defendant's house on school mornings and then picked her up after school. The defendant told the victim about a job he had applied for, and the victim was concerned that "the order of protection would show up" in his background check.

Ms. Perry testified that she received an email from the victim on Friday, April 12, 2013, which she read aloud in court:

I woke up this morning and my phone was missing. I sleep with my phone. Like I use an app for white noise and an alarm. I asked [my daughter] if she had my phone and she said no. I heard some creaking around at four to five a.m. this morning, but I thought it was [my daughter] and I rolled back over.

I'm totally creeped out. I know I forgot to set my alarm last night. I was so tired from three hours of dance that I think I forgot. I don't know how he would have gotten in and me not notice.

So I look around everywhere for my phone. I always unplug it after my shower and poke around it while I air dry. It was not there after my shower. I know I woke up on time, but I don't remember much else. So I looked everywhere around my house and didn't see it.

I got to work and checked my e-mails. My G-mail had been messed with. All my e-mails to [my attorney] were erased and all from my mom, so I think he has my phone. I had it turned off. OMG. I am still so creeped out if he snuck in and got my phone while I was sleeping.

Have I just lost it? How would he hack my G-mail? Weird shit. I need your cell number. I am going by C-Spire to get another phone after work and drop the paperwork off if you are able or I can get it from you this weekend.

Ms. Perry said that she then sent her telephone number to the victim by return email and, later that evening, was telephoned by the victim, who said the defendant's "behavior had deteriorated and she was very fearful." On Tuesday, April 16, Ms. Perry received a phone call from the school where the victim taught and was told that the victim had not shown up for work that day. Ms. Perry then checked and found that the victim's children were in their classrooms at the school where Ms. Perry taught. The school security officer drove Ms. Perry to the victim's home, where she found the victim's car in the driveway and the house locked. A key was obtained from the victim's

mother, and officers entered the residence. Ms. Perry described the victim's bed, saying that "the covers were thrown back and there was an indentation in the pillow from her head[,]" making it appear that "she had gone to bed and just gotten out of bed."

Officer Joshua Vest of the Germantown Police Department testified that on April 16, 2013, he received a telephone call from Riverdale Elementary School asking him to meet a school resource officer at the victim's residence regarding a missing person. At her home, her car was in the driveway and the front door was locked. He got a description of the victim and directed that a BOLO, or be on the lookout alert, be made by the police dispatcher. Officer Vest also went to the defendant's apartment, where there was no response to his knocking on the door or window. About two hours later, he returned to defendant's residence, who, this time, responded to a knock on his door by asking if the victim had been found. Officer Vest testified that, later, inside the defendant's residence, he found the defendant to be "[v]ery, very off-putting almost. No concern . . . that his wife was missing." The defendant was asked to come to the Germantown Police Station, which he did, following the detectives in his own vehicle.

Detective Michael Cook with the General Investigations Division of the Germantown Police Department testified that, on April 16, 2013, he went to the defendant's residence. He spoke with the defendant, who invited the officers into his apartment. Detective Cook said the defendant told them he had received an email from the victim, saying, "Come get [our daughter]. I cannot face everyone with this. Please forgive me. It is too much. Please raise them to remember me as their loving mommy." The email bore the date April 15, 2013, at 23:52:34 hours. Detective Cook described the defendant's demeanor as "calm. I mean, pretty nonchalant, I guess. I mean, didn't appear to be worried."

Detective Ryan Carter testified that he was present at the initial interview with the defendant and later went to the victim's residence to take photographs. He said that, during this first interview, the defendant claimed to have no knowledge of what had happened to his wife. Following the interview, the defendant left the Germantown Police Station.

Detective Amanda Hollin with the Germantown Police Department testified that she interviewed witnesses Jesika Moxley and Edward Raulerson, as well as prepared the search warrant for the defendant's vehicle. During the defendant's first interview with officers, he gave permission to search his cell phone, and Detective Hollin performed the search. One text message was sent from the defendant's phone on April 16, 2013, at 1:36 a.m. to the victim's phone and said, "[P]lease call me, I'm freaking out. I can't and never wanted to do this alone. I only want 50/50. Please don't do something foolish."

Detective Hollin next described a text message sent from the defendant's phone at 1:49 a.m. to the victim saying, "[P]lease call me. I love you do (sic) much. I didn't want this. I only wanted to let you know I wasn't going to protect your secret and let my kids be taken from me. We can stop this and come together." Another message was sent from the defendant's phone at 2:25 a.m., which said, "I'm begging you please, for the love of God, don't do this. The kids need you, I need you. I will do anything so long as I can stay in their lives." A message sent from his phone at 2:28 a.m. said, "I promise I won't tell anybody. As far as I'm concerned, it never happened. I just want equality. Please, my love. Please call me." The next message sent at 1:32 p.m. said, "[Y]ou have the police interviewing me because I gave you the benefit of the doubt."

Detective Hollin testified as to the outgoing calls from the defendant's phone to that of the victim, saying that a call lasting one minute and twenty-four seconds was made at 2:09 a.m. on Tuesday, April 16; another call at 2:51 a.m. the same day lasting one minute and thirty-nine seconds; a call at 3:01 a.m. lasting two seconds; and a final call at 7:37 a.m. lasting fifty-seven seconds.

The next witness, Dr. James Latta, a licensed professional counselor testified that the victim had been a patient of his, as had her two children. He said that the defendant came to his office on April 8, 2013, and asked how his children were doing. Dr. Latta said it appeared that the defendant wanted his wife to be encouraged to continue in the marriage.

Dara Newberry testified that she and the victim were good friends, as were her children with the victim's children, and she had lived in the same townhouse complex as the victim and defendant. Ms. Newberry said that the victim worked, while the defendant remained at their home. In January 2013, the victim told Ms. Newberry that, in the fall of 2012, the defendant had "thrown her on the ground and choked her." Previously, the victim had told her that she was leaving the defendant because he had had one or more affairs. The victim had a plan to leave and had located another place to live. Also, they discussed the victim's hiring a lawyer. Ultimately, the victim moved out of the townhouse on January 1, 2013.

Blair Jones testified that that she was acquainted with both the victim, who had taught her children in school, and the defendant, whom she had met through the victim. The victim lost a "significant amount" of weight in 2010, before she and Ms. Jones became closer friends. She invited the victim and her family to a Thanksgiving-type dinner at her house in 2011, and they came and had a "wonderful time." They returned the following year, although uninvited, and the victim came back to her house the following day to say she was going to move to a rented house, but the defendant would not be doing so. Ms. Jones last saw the victim on April 13, 2013, just before she

disappeared, at Rock and Romp, a family music festival. The victim was by herself at the time and told Ms. Jones that her children and the defendant were there also. The victim said that the defendant was there "stalking" her. Also, the victim said that she knew the defendant had been inside her house, and she believed he had broken into her house the night before and taken her telephone.

Jesika Moxley testified that she and the victim were teachers at Frayser Achievement Elementary School. She said that, in the fall of 2012, she went into the victim's classroom, and the victim was not excited and happy as usual but was "collapsed at her desk, crying about something." The victim was "devastated[,] and she decided that she was going to leave her marriage" but "didn't know how she would do that because she was afraid of him." She said that, if she left, "he'll take my kids from me." Ms. Moxley advised her to begin removing the defendant's name from their accounts and credit cards. In October 2012, after school, they went to the victim's house to pick up her children and go to the gym. Inside, the defendant began "screaming" at the victim, saying she was a "bitch for making him have to do everything" and "just complaining about being the Mr. Mom in the house." Ms. Moxley said that the defendant's demeanor "changed" when he saw that she was in the house. She told of a work holiday party in December 2012, attended by the victim and the defendant, where the victim was "dancing and having a great time just being herself" but not "really intermingling with" the defendant. Ms. Moxley saw the defendant "grab[] [the victim] by the arm and . . . h[o]ld her . . . [k]ind of like you do a child when you're scolding them in the grocery store." He told the victim, "[Y]ou're embarrassing me, you're not around me at all, I'm here by myself. You know, you're dancing with all these other people. Why aren't you with me[?]"

Ms. Moxley saw text messages and heard voicemails sent by the defendant to the victim after she moved out in January 2013. Some were "pleading with her to not leave him," while others were "very aggressive," typed in all capital letters, saying "[Y]ou're a heartless bitch for doing this to us, our kids are going [to] hate you, I'm not going to let you get away with leaving me." According to Ms. Moxley, the victim received texts and voicemails from the defendant "[m]ultiple times a day." The defendant showed up uninvited at the victim's classroom on Valentine's Day 2013, and she told him to leave. On a later day, when Ms. Moxley and the victim left the school together, the defendant was standing behind the victim's car. As the victim put her cell phone to her ear, the defendant walked to the driver's side of her car, and she quickly backed out. The Thursday or Friday before the victim disappeared, she told Ms. Moxley that, when she had awakened the previous night, her cell phone was gone; and, around 3:00 or 4:00 a.m., she thought she heard footsteps in her house and assumed it was her daughter. Earlier she had told Ms. Moxley that a hearing was scheduled in her divorce proceeding that would formalize the custody arrangement. The victim wanted custody of both children.

The defendant did not show up for the scheduled court date; so another one was set, and the victim anticipated she would be awarded custody of both children. The victim had in her email account a file containing all correspondence between her and her lawyer, Bill Bruce; and, finding that it had been deleted, she became certain that the defendant had taken her cell phone.

Ms. Moxley said that on Monday, April 15, the victim's demeanor at school was "[s]toic . . . [v]ery bland and almost scared," which was unlike her. The victim told Ms. Moxley that the previous weekend, the defendant came to her house and tapped on one of the windows, calling for the children to let him in. The victim was furious and screamed at the defendant to leave. The victim told Ms. Moxley about the court date set for Friday, April 19, and said she did not want to report the defendant's coming to her house because she did not want "to wake a sleeping beast" and wanted "to play it calm." The victim believed that she would be awarded at least temporary primary custody of her children at the hearing.

On Tuesday, April 16, Ms. Moxley noticed that the victim's car was not in the school lot when she arrived at 7:30 a.m. and thought it was unusual for the victim not to have arrived by that time. She telephoned the victim's cell phone, but the calls went to her voicemail "over and over." Using the victim's Facebook account, she sent a message at 8:30 a.m. to Melissa Smith, one of the victim's friends listed on her account, asking that she call Ms. Moxley regarding an emergency. Ms. Smith sent a response at 8:36 a.m., containing her office telephone number.

James Dennis testified that he was the principal at Frayser Achievement Elementary School, where the victim was a teacher at the time of her death. Because of her need to take time off from work resulting from her ongoing divorce, the victim kept him informed regarding it and the child custody dispute. She said she wanted to get full custody of her children at the next hearing. The victim told him, "[I]f anything ever happens to me, if I ever come up missing, I want you to know that [the defendant] did it." She also said that the defendant had put his hands on her before, and it was "not going to happen again." Also, they had financial problems, and she said that money had come up missing a few times.

The morning that the victim went missing, two of the teachers asked Mr. Dennis if the victim had called about not being at work. They first called her emergency contact number, her mother, who had no explanation, and then contacted the police to report that the victim was missing.

Melissa Smith testified that she became friends with the victim at their neighborhood gym, and their daughters were friends as well. She learned in the fall of

2012 that the victim wanted to divorce the defendant on the "friendliest grounds possible." The victim's plan was to tell the defendant in an email on January 1, 2013, where she and the children would be living; and Ms. Smith believed the victim sent the email to the defendant. She said that the defendant wanted to reconcile with the victim, who did not want to do so. The defendant came to the victim's new residence and embarrassed her by serenading her, appeared at her school with flowers and gifts, and showed up, unexpectedly, at various places.

The Thursday before the victim disappeared, Ms. Smith, the victim, and others were exercising at the Germantown Athletic Club and decided to record a video with a dance instructor who was leaving. The victim told Ms. Smith that her phone was missing from the table by the bed and that emails between her and her lawyer had been deleted from her computer. The following Saturday, Ms. Smith and the victim went together to the Rumba Room, a Latin dance place, and the victim was wearing "a beautiful dress" she had been given. On Monday, April 15, 2013, just before their 5:30 p.m. exercise class, the victim sent a text message to Ms. Smith saying she was not coming to the class. After the class, at 6:34 p.m., Ms. Smith texted the victim, saying that she missed her at the class, and the victim responded, "Had to nap. I am getting no sleep. Afraid [the defendant] is lurking. Lawyer says it is stalking." The next day, Tuesday, April 16, 2013, around 8:15 a.m., Ms. Smith received a Facebook message from the victim's account asking her to call the phone number listed in the message and stating that it was an emergency. Ms. Smith then sent a return message giving her office phone number. Ms. Moxley called her and said the victim had not shown up for work.

Edward Raulerson testified that he first met the victim in 1993 when he was in the ninth grade and the victim in the seventh grade, and they dated for two years. He then moved with his family to Richmond, Virginia, and kept in touch with the victim through letters, phone calls, and, later, emails. In 2003, as he and his girlfriend were coming through Memphis, they had dinner with the victim and the defendant. Afterwards, he and the victim kept in occasional contact. In March 2013, with the victim's birthday approaching, he contacted her through Facebook and learned what had been happening in her life. They continued to stay in touch through Facebook, text messaging, and telephone calls. On March 14, 2013, he received a Facebook message from the victim saying that the defendant had threatened her, "came over in the middle of the night, woke [the victim] up, cried and marched off toward the train tracks with the train coming." Mr. Raulerson was living in Johnson City at the time and kept in daily touch with the victim. Two or three weeks before she disappeared, they became "flirtatious" and discussed meeting in May 2013. The victim told him that, just before she left the defendant, she had examined his cell phone while he was taking a shower and found text messages from a person named "Max." The defendant saw her looking at his cell phone and "tackle[d] her to the ground. And as she described to me, damn near broke her arm trying to get the

phone from her hand." On the Thursday or Friday before she disappeared, the victim told Mr. Raulerson that her cell phone was missing. That morning, he sent her a text message saying, "Good morning" and received a return message "that was more sexually explicit than previous messages from her" and "went along with it." He later learned from the victim that her phone was missing and that she had not sent the messages to him. The Saturday before the victim disappeared, he spent "[m]ost of that day" talking with her on the phone.

During their conversations, the victim told Mr. Raulerson that the defendant had shown up at her son's karate class, so she had to end their conversation. Later that day, she sent Mr. Raulerson a photograph taken at Rock and Romp and said that the defendant had shown "up there and was following her around the whole area." The victim also told him of a previous day during which the defendant had shown up unannounced at her residence and "shove[d]" a box of "Christmas stuff" into her hands and then walked in. Also, she told him of an incident which occurred around 3:00 a.m. on the Sunday before she disappeared, when the defendant had shown up and awakened her as he was tapping on the window of her son's room, and she told him to "get out of here right now." The following evening, on April 15, 2013, Mr. Raulerson was speaking with her and, about 10:30 p.m. Eastern Time, texted her to say goodnight and received a response that said "shot," and he presumed that she had intended to type the word "shit." Because he did not understand this message, he responded with a question mark and almost immediately telephoned her and heard her "screaming" at the defendant, saying, "Chris, get out. Chris, get out. You need to go." He heard the defendant tell her that he needed two minutes of her time, and she responded "[I]t's always two minutes with you. Two minutes is never enough. You need to go. You need to get out now." Finally, she told the defendant that he had "two minutes" and told Mr. Raulerson to call her back in two minutes, which he did. The tones of the victim's and the defendant's voices were angry, and the victim told Mr. Raulerson that she would talk to him later, but she did not call him again. He received a message from the victim's Facebook account at 11:37 p.m. that night, Monday, April 15, 2013, which he read aloud:

> He knows everything. I can't believe I was such a fool. I'm taking the money I have and I'm leaving. I can't bear this. It's too much. All my friends and family are going to realize the truth and I will never be able to get them to trust me again. I am so sorry I did this to you. I . . . should have backed out with you when I had the chance. You have been wonderful during these past few months and I hope we will meet again some day. For now, I have to say goodbye.

> . . . .

-9-

And I wish nothing but the best for you.  Goodbye.

Mr. Raulerson said that he read the message the following morning and that "[i]t seemed off.  It didn't seem like [the victim]."  Then, he discovered that he had been blocked from the victim's Facebook account and saw that the message he had received did not include a picture of her, as had been the case before.  He tried to get in touch with the victim by phone calls and text messages, even using the telephones of others, but was unable to reach her.

Jennifer Jones testified that she had lived across the street from the victim.  She said she saw the defendant leave the victim's house between 9:30 and 9:45 p.m. on the evening of April 15, 2013.  He came from the carport area, went to the driver's side of his car, and either put something in or took something out before returning to the carport.

Cari Cooper testified that she was a fitness instructor at the Germantown Athletic Club and was a friend of the victim, who had been in her class.  Because Ms. Cooper was also a Memphis police officer, the victim told her and others in late 2012 that she was planning to leave her husband and that she was "scared."  After moving away from the defendant, the victim told Officer Cooper of "pretty scary situations" she was experiencing with the defendant.  The victim saw the defendant in his car, backed into her long driveway and sitting with the lights turned off.  Another time when she arrived home, the defendant was sitting on her front porch, again uninvited, and playing his guitar.  Officer Cooper advised the victim to install an alarm system at her house and call the Germantown Police Department if there was anything out of the ordinary.  However, the victim said that she was too scared to call the police because she was afraid the defendant "would lose it" if he found out.

When Officer Cooper finished her shift with the Memphis Police Department around 3:00 a.m. on Tuesday, April 16, 2013, she drove past the Westminster Townhomes in Germantown.  She saw a vehicle come out of the complex, being driven "erratically" and nearly hitting a curb.  She pulled up beside the vehicle and saw that the driver was the defendant, who was "[k]ind of wild-eyed."  The defendant made a right turn off Poplar Avenue onto Riverdale.  Later that morning, Officer Cooper received a telephone call from Melissa Smith, one of their friends, who was "frantic," saying that the victim was missing and had not shown up at school that day.  Officer Cooper went to the victim's residence and found Germantown police officers already there.  She told them the circumstances under which she had seen the defendant earlier that morning.  Next, she went to the defendant's residence and determined that neither he nor his vehicle was present.  Germantown officers soon arrived, and she said she would wait there until he returned.  About ten minutes later, between 11:00 a.m. and 12:00 p.m., he returned and Officer Cooper notified the Germantown dispatcher.  She did not attempt to speak with

the defendant.

James McNamara testified that he had worked with the defendant at Papa John's Pizza in 2011 or 2012. In April 2013, Mr. McNamara was working at an All in One gas station at Poplar Avenue and Kirby Parkway. He said that on April 16, 2013, the defendant came to the gas station at approximately 3:18 a.m. to purchase some items. He was there about ten minutes, and they talked about the defendant's divorce, a subject they had not discussed before. The defendant said he had gotten an email the previous night from the victim, saying "that he needed to come get the kids."

Detective Jeffrey Gammill testified that he was employed by the Germantown Police Department and participated in the investigation of the death of the victim. He said that a tracking device was placed on the defendant's vehicle, and he followed it on April 19 and into April 20, 2013. On April 24, Detective Gammill went to 12503 Highway 64 where the victim's body had been found the previous night. Officers discovered some type of a buckle in the charred remains of the burn area.

Chastity Wamble testified that she was the property manager at the Westminster Townhomes and was acquainted with both the victim and the defendant, who had remained there after the victim moved out near the beginning of January. Ms. Wamble said that a few days before the victim went missing, likely on a Friday, the defendant came into her office, saying he had the victim's cell phone and that he "now [had] evidence that she's been having an affair." He wanted to read text messages to Ms. Wamble, but she responded that she did not "really want to be a part of this."

On April 16, 2013, Ms. Wamble learned from the victim's cousin that the victim was missing and spoke with the defendant on April 19, when he called to say he was trying to arrange to pay the April rent. She told him that, because of a search warrant from the Germantown Police Department, the door to his townhome had been "re-key[ed]," and he would need to come by the office to obtain a new key. On the Monday of the week the victim disappeared, the defendant, who was "[p]retty emotionless," came by Ms. Wamble's office to get a new key to his townhome. The following day, the defendant returned to the office. Ms. Wamble asked if he had learned anything about his wife's disappearance, and he replied that "his main focus really at this point was to seize [the victim's] assets." He said there was a court hearing scheduled for the following Friday, and "he was going [to] try to seize [the victim's] assets, her car being the most expensive asset, so he could pay for an attorney because he wanted to make sure that he could get his children." The defendant was "very emotionless in his expressions." Asked how he was doing, the defendant responded that he was "relieved because [he did not] have to deal with [the victim] Friday at court and then he said, on the other hand, I'm concerned because it's my wife."

William Bruce testified that he was an attorney and had represented the victim in her divorce action against the defendant in 2013. He said that the status of the suit, as of April 15, 2013, was that the defendant had not appeared at an earlier court-ordered mediation and a hearing had been set for the Friday following the victim's disappearance, during which Mr. Bruce "hoped to address the Judge . . . regarding a potential change of custody." The custody arrangement at the time was voluntary, with their son spending most of the time with the defendant and their daughter spending most of the time with the victim. He said that in March, he had filed for the victim a petition for temporary emergency custody "because of some allegations that [the defendant] had been leaving the children unattended." Mr. Bruce related a conversation he had with the victim on December 28, 2012, regarding her possibly seeking an order of protection against the defendant:

> She relayed to me that approximately within the two weeks preceding that particular meeting on the 28th that she had found some troubling text messages on [the defendant's] cell phone and had shown them to him. He became belligerent and screamed at her, assaulted her by knocking her to the floor face-first, pinned her to the floor and pried the phone out of her hands. She relayed to me for that particular instance she was scared of further violence, so she left the home.

Additionally, Mr. Bruce described an earlier incident in which the defendant's conduct frightened the victim:

> She relayed to me that that was not the first time that it happened, that some time before the . . . previously described incident, there had been another incident where she had found some disturbing text messages on [the defendant's] phone and that when she read them to him or showed them to him – I'm not sure which – that he became very angry, started screaming at her. She described it as veins bulging on his neck, that he pushed her hard or shoved her. And again, because she feared more violence, she left the home that time.

Mr. Bruce said that he had advised the victim to take a Petition for Order of Protection, which he had prepared, to the Family Safety Center, if she wished. However, she was concerned that it would "enrage" the defendant; so it was not filed.

Early in his representation of the victim, Mr. Bruce recommended that she keep a journal regarding "things that ha[d] been going on during the pendency of the divorce action" and advise him of what occurred. He said that about a week and a half prior to

the victim's disappearance, a mediation had been scheduled, with the victim and both lawyers present, but the defendant contacted them to say he had decided to cancel the mediation. The Thursday or Friday before she disappeared, the victim contacted Mr. Bruce again asking about obtaining an order of protection. She sent him an email on Friday, April 12, around 10:00 a.m., saying she believed the defendant had come into her residence the night before and taken her cell phone. When she arrived at work, she checked her email account and found that both the folder containing her emails to and from Mr. Bruce, as well as the folder containing deleted emails, had been deleted.

Mr. Bruce said that the following Monday, April 15, he received a detailed email from the victim at 12:13 p.m. describing several events that had occurred over the weekend. Mr. Bruce read aloud the email wherein the victim stated that she believed the defendant had been in her home while she was in the shower and taken her cell phone; that the defendant came to her house Friday at 11:15 p.m. demanding the children's tablets; that the defendant was in her driveway on Saturday when she returned home from taking their son to a karate class and demanded that their son take the phone everywhere he went or the defendant would start showing up; that the following morning at 4:45 a.m., the defendant was tapping on their son's window; and that the victim felt that the defendant's behavior was escalating.

Mr. Bruce's last communication was when he talked with her by telephone later that day and advised that she change the locks and keep the defendant from her house. She responded that it would be difficult because they were "strapped" for money. Mr. Bruce told the victim that with all the defendant had done, especially failing to show up for a court-ordered mediation, there was a chance the judge would change the custody arrangement. Accordingly, the victim "[v]ery definitely" planned to attend the court hearing on April 19. Mr. Bruce said that he also hoped to take up at the hearing motions to have the defendant submit to a psychological evaluation. The victim did not appear at the hearing, although the defendant did. The attorney who had been representing the defendant was allowed to withdraw, and no decision was made as to a change in the custody arrangement. The defendant testified at the hearing and was asked about how he had obtained the text messages from the victim's telephone. The defendant said that "he was torn between trying to get a lawyer and going out and trying to find out what had happened to his wife."

Detective Anthony Kemp with the Germantown Police Department testified that on April 16, 2013, he became involved in the investigation regarding the victim's disappearance. As he was doing background research on the victim and the defendant, he was told that the defendant had come to the police department to speak with detectives. He and Detective Carter then interviewed the defendant for approximately four hours. The defendant told them that he had gone to the victim's house around 9:15 p.m. on April

-13-

and that their "conversation did not go very well at all," so he left around 11:15 p.m. and returned to his residence. Later that evening, he received an email from the victim saying, "I'm sorry, and in such words, this is more than I can handle, come get [our daughter]." He soon returned to the victim's house, where he found the back door unlocked and their daughter asleep upstairs. He took her, locked the door, and returned to his residence. About an hour later, he returned to the victim's house, which still was locked, and, on the outside, everything appeared the same as when he had earlier been there. As he was returning to his residence, he stopped at an All in One gas station, where he stayed for about ten minutes, and then stopped at a Walgreens before returning to his residence. The defendant's demeanor was "stable, calm" throughout the interview, and he left the police station following the questioning. The following day, April 17, Detective Kemp executed a search warrant at the defendant's home. He identified several photographs taken at the defendant's residence, including a desktop computer, four hard drives, a laptop computer, and two Bibles opened to the book of Malachi. The following week, attempts were made to reach the defendant by telephone, but Detective Kemp was unsuccessful in doing so. However, on April 23, 2013, Detectives Kemp and Wallace saw the defendant at the apartment complex where he resided. They "[k]nocked on his door for about five or ten minutes and he did not come out." Ms. Wamble told the detectives that she had seen the defendant walking his dog about thirty minutes earlier. Detective Wallace then called the Shelby County Sheriff's Department and asked that a cadaver dog be brought to search the area around the defendant's residence. As the dog was walking around the apartment area, the defendant came out of his residence, and the detectives notified the dog handler to stop the search. They then approached the defendant and asked that he come to the police station to give another statement; and he responded that he wanted to follow up on looking for a job and could not meet with them until later that afternoon. A tracking device which had been placed on the defendant's vehicle showed officers where he had parked it when he appeared that afternoon for his interview. So, the sheriff's department again was contacted and brought its cadaver dog to the defendant's vehicle. Initially, another detective talked with the defendant, but around 4:00 p.m., Detectives Kemp and Wallace began questioning him again. A "big inconsistency" between the defendant's first and second statements was the defendant's saying that, when he returned to the victim's house the second time that evening, he "went through all the rooms and so forth." As the defendant was questioned during the second statement, he became "[m]ore emotionless."

The defendant originally told officers that he had put the victim's body, wrapped in a vinyl air mattress, in the back of a pickup truck parked at a gas station at Highway 64 and Collierville-Arlington Road. Officers went to this station and reviewed the surveillance video of the area but found no evidence of such a truck's having been there. During the first interview on April 16, the defendant told officers that the scratches on his arms occurred when he was playing with his dog. In the second interview, he said the

-14-

victim had scratched his arm as the two of them were "struggling over her cell phone." The defendant made a sketch, during that interview, trying to show detectives where the victim's body was buried. Also, he offered to lead detectives to where he had left the victim's body. The defendant was arrested, and Detective Kemp went to the location where the victim's body had been found.

Lieutenant Kevin Simpson testified that he was employed by the Germantown Police Department in the patrol division and had been trained in crisis intervention. On April 24, 2013, he received a call from the jail requesting an officer to come talk with the defendant, who was "emotional and requesting to speak with an officer." He said he met with the defendant who was "a little emotional," wiping tears from his eyes, and said he "just needed to get some things off of his chest." The defendant then proceeded to tell Lieutenant Simpson that he earlier had falsely told other officers he had killed his wife when, in fact, she had committed suicide:

> And he went on to say that he actually went over that night and found that she had committed suicide and found her body in the kitchen. And . . . he described what she looked like. He said that her face was purple and that her tongue was hanging out of her mouth. And he continually – getting increasingly emotional when he was talking about this and wiping tears from his eyes.

> And then he went on to talk about – after talking about that, I was sitting there listening to him talk. And he said, you know, we've been going through some divorce proceedings recently. He started getting less emotional and started talking more about their divorce. And he was saying things like . . . I know she has a plan to divorce me, to get my kids and . . . continue to have a life [with] this other man that she's having an affair with.

Lieutenant Simpson said that, as the defendant continued, his demeanor changed from "weeping" to less emotional as he said the victim had a "plan and that it was to ruin his name and to drag him through court and get the kids and go on with this ongoing affair that she's been having with someone else." The defendant continued and told what he had done with the victim's body:

> He said he found a nice, quiet place. It was a raised, grassy area. He described it having a creek -- or . . . brook beside the area. You could hear the water running. He said that it was grassy.

> He went and gathered some leaves and sticks and things and made

like a bed or an area on the ground to lay her body.  That he then went to the car, retrieved her body, put her body on the sticks and leaves, and then put more debris and leaves and things on top of the body.  Went back to the car, retrieved a can of gas, poured it on her, and lit her body on fire.

Lieutenant Simpson said that, as the defendant was first talking to him, he said that he had made false statements to the other officers because he wanted to "protect [the victim's] image for their children so that they wouldn't think that . . . she committed suicide.  That he wanted to protect – I think the exact words he used w[ere] protect our marital covenant."  The defendant continued, saying that he had been reading the Bible and "came to the realization that he needed to do that, that he would come clean as to what was happening.  What actually happened."

Detective John Durfee testified that he was employed by the Germantown Police Department and became involved in the investigation on April 16, 2013.  As the defendant left the police department after giving his first statement, he was followed by Detective Durfee and another officer, operating two separate vehicles.  The defendant drove to the victim's residence but was unable to enter the driveway because a police car blocked it.  The defendant then left and drove to his own residence.

Subsequently, officers obtained a search warrant, and placed a tracking device on the defendant's vehicle, which they began following.  Detective Durfee said that, on April 23, he was informed that the defendant had confessed, and officers were directed to go to a gas station in the Lakeland area of Shelby County.  At this location, he reviewed security camera footage to see if it showed the defendant's moving the victim's body into the back of a pickup truck.  The video did not support the defendant's claims regarding the body.  Officers then were informed that the defendant had just said that he had taken the body to a different location in the area, near a creek, where he had burned it.  Officers received more detailed instructions and located the place the defendant said he had taken the victim's body.  After dark, they reached the thickly forested area, in Shelby County, near the Fayette County line.  On foot, they went into the forested area about fifty yards and found human bones at what appeared to be a burn site.  A burned human body was positioned on short logs, which also were burned.  The medical examiner was notified and removed the remains from the scene.

Samantha Spencer testified that she was employed by the Tennessee Bureau of Investigation ("TBI") as a special agent forensic scientist and as a member of the Violent Crime Response Team.  On April 24, 2013, the TBI was asked to examine the defendant's vehicle, which was being stored at a location by the Germantown Police Department. She detected a white substance on the rear passenger's door handle, which appeared to be "a cleaning substance of some nature," but was unable to determine

exactly what it was. More of the white substance was found on the seat adjustment handle of the driver's seat.

The white substance also was located on the rear passenger's seat on the driver's side and on the back of the front seats, as well as the driver's headrest. The trunk of the defendant's car contained a sleeping bag, a computer bag, a brown backpack, cleaning items, paperwork, a black can, and a red gas can.

At the victim's residence, Ms. Spencer used a chemical called Luminol to look for evidence of blood on the carpeted area in the living room. On the carpeted area, there was a positive reaction to the Luminol, and samples cut from the carpet of the spots reacting in that fashion were sent to the TBI Laboratory for further analysis. Agent Spencer's subsequent testing at the lab also confirmed the presence of blood on the carpet. The DNA profile of the blood on the carpet matched that of the victim. A pair of flip-flops, which were in the backpack in the trunk of the defendant's vehicle, and a pair of shorts from the rear floorboard were tested and found to have traces of the defendant's blood. Blood also was found on the floor of the victim's kitchen, and, in the opinion of Ms. Spencer, it was that of the victim. Blood on a rope at the site where the victim's body was found matched her DNA profile.

Agent Randall Nelson testified that he was employed by the TBI and assigned to the Trace Evidence Unit of the laboratory. He analyzed the liquid in two gallon paint cans and determined they contained a gasoline range product, which could be used to start a fire.

Judy Burford testified that she was the keeper of the records for Dental Works, which was operated by Dr. Dietz. Entered into evidence through her were a set of the victim's full dental x-rays from July 7, 2008, as well as dental records from March 11, 2013.

Dr. Edgar Turner testified that he was a forensic odontologist, or forensic dentist. He testified that, in his opinion, based upon a comparison of the 2008 dental ex-rays of the victim with the teeth of the human remains, the remains were those of the victim.

Dr. Miguel Laboy testified that he was a forensic pathologist employed at the Office of the Medical Examiner in Nashville. He performed an autopsy on the body of the victim on April 24, 2013. He said that she had thermal injuries throughout her body, and her remains measured forty inches in length and weighed seventy pounds. He said that the injuries to the victim's body included fractures to the extremities and that her remains were decomposing, had burned skin, and "a lot of insect activity or flies and maggots in the organs." On the "Adam's apple," the thyroid cartilage, there were

-17-

fractures on both sides. He said that damage to the cartilage such as he found was "commonly seen in cases of strangulation, either manual or ligature. Because of the thermal injuries to the body, Dr. Laboy could not determine whether the victim sustained the type of damage to the skin that would have resulted if she had struggled with an attacker. He said that he did not see trauma to the surrounding area which would have occurred if the fractures had resulted from a fall. He could not determine whether the victim was alive when she was burned. He could not tell whether the victim had struggled with her attacker, because her skin had burned away and her hands and extremities were missing. The victim's neck was not broken. Dr. Laboy said that, in his opinion, the cause of death was asphyxiation, and the manner of death was homicide. While the victim might have survived the fractured bones in her neck, the fact that her head was covered with plastic and she was burned would mean that if she had regained consciousness, she would have suffocated.

On cross-examination, Dr. Laboy said that the victim had suffered fourth degree burns, meaning that her muscle and bones had burned.

Following the testimony of Dr. Laboy, the State rested its case-in-chief, and the defendant did likewise, without presenting any proof.

## ANALYSIS

We will review the issues raised by the defendant on appeal.

Prior to the trial, the State filed a motion, pursuant to Tennessee Rule of Evidence 404(b) to introduce evidence at trial that the defendant "physically and verbally abused," as well as threatened the victim. The State described this evidence as prior statements by the victim and statements of witnesses. Further, the motion asserted that "because the [d]efendant killed the victim, at least in part, to keep her from going to the civil court hearing on Friday, April 19, 2013, the State also intends to offer evidence of the victim's prior statements, pursuant to Tenn. R. Evid. 804(b)(6)." The defendant opposed admission of any of this evidence at trial and has presented the introduction of this evidence as issues on appeal.

### I. Application of Forfeiture by Wrongdoing Exception to the Hearsay Rule

On appeal, the defendant argues that the State failed to show by a preponderance of the evidence either that he killed the victim or that his "alleged wrongdoing was at all for the purpose of making her unavailable to testify at the hearing on Friday, April 19." Thus, first we will review the sufficiency of the evidence as to the defendant's killing the victim and that the killing was done to prevent her from testifying at the upcoming

hearing regarding custody of their children.

Arguing that hearsay testimony should be allowed in showing that the defendant killed the victim to prevent her from testifying at an upcoming hearing in their pending divorce action, the State relied upon Tennessee Rule of Evidence 804(b)(6), which provides as follows:

> Rule 804. Hearsay Exceptions; Declarant Unavailable
>
> (b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (6) Forfeiture by Wrongdoing. A statement offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness.

In <u>State v. Ivy</u>, 188 S.W.3d 132 (Tenn. 2006), our supreme court set out the procedure to be followed regarding application of Rule 804(b)(6), explaining that, before allowing evidence of forfeiture by wrongdoing, the trial court should conduct a hearing, out of the presence of the jury, and determine if a preponderance of the evidence established that the defendant was "involved in or responsible for procuring the unavailability of the declarant," and that the actions of the defendant "were intended, at least in part, to procure the absence of the declarant." <u>Id.</u> at 147.

Prior to the trial in this matter, the court conducted such a hearing, during which a number of witnesses testified regarding evidence showing that the defendant killed the victim, at least in part, to prevent her from testifying at an impending court hearing at which she intended to seek full custody of both children. At that hearing, the court initially advised the parties that the court additionally would consider, in ruling on the State's Rule 804(b)(6) motion, testimony which the State earlier had presented at the hearing on the defendant's motion to suppress his statements to police investigators.

Testifying for the State at the earlier hearing on the motion to suppress the defendant's statements were Germantown Detective Anthony Kemp and Special Agent Chad Anderton of the United States Secret Service.

At the suppression hearing, Detective Kemp testified that, on April 16, 2013, the defendant voluntarily came to the Germantown Police Department and was escorted to an interview room, where Detective Kemp orally advised him of his <u>Miranda</u> rights, which

he waived. The defendant admitted that he went to the victim's house on April 15, 2013, to try to "reach a level agreement before their court date on the coming Friday because he said it was a waste of money." He also wanted to speak with her about an affair he believed she was having and try to reconcile their marriage. Detective Kemp testified his impression was that the upcoming April 19 hearing was "extremely important" to the defendant. The defendant said that, on the evening of April 15, 2013, he had been at the victim's residence, and the two "end[ed] up in a struggle over [a] phone," which she earlier had told him was missing, and he received scratches on his arm.

While the defendant was giving these statements, a cadaver dog was taken to the area where the defendant had parked his car, and the dog "pick[ed] out" the defendant's vehicle. When told of the dog's reaction, the defendant first said that he sometimes put dead animals in his vehicle. After officers explained that the cadaver dog would not react to a dead animal, the defendant said that the victim had "lost her footing on the top step, concrete step, coming out into the carport and fell and cracked her head on the right side." He said he tried to revive the victim with water and, then, took their daughter to his apartment. He returned to the victim's residence and cleaned up the blood on the kitchen floor. He put the victim's body inside an air mattress, along with some of her personal belongings. He told the officers that he moved the victim's body into the back of a pickup truck that was parked "down Stage Road somewhere." Asked by the officers to lead them to where the truck was parked, the defendant said he had been by the location and the truck no longer was there. Other detectives went to the location and determined that the surveillance video did not show his vehicle being there at the time he had claimed. Confronted with this finding, the defendant next said he paid another person $200 to remove the victim's body. Told by officers that they did not believe him, the defendant then said that he had placed the victim's body in the vicinity of the truck's location, putting it "beside kind of a small little creek and that he wanted a Viking burial funeral for her." He said that he had set the body on fire, using leaves and gasoline to burn it.

On April 24, Detective Kemp was told that the defendant wanted to speak with him, and he went to the jail where the defendant was housed. He told Detective Kemp there "was no way that he could protect [the victim] and then he finally said look, I got her hanging in the house."

Chad Anderton testified that he was employed by the United States Secret Service as a Special Agent Polygraph Examiner. He said that he first received a telephone call from the Germantown Police Department regarding the matter and, then, on April 23, 2013, went to their office, where he was told the defendant wanted to ask him some questions about a polygraph examination. He was alone in an interview room with the defendant, talked with him about the examination, and advised him of his

-20-

Miranda rights. The defendant said he understood his rights and signed the waiver of rights form. However, the polygraph examination was not administered to him.

At the subsequent hearing on the State's Tennessee Rule of Evidence 804(b)(6) motion, Detective Kemp again testified, saying that he became involved in the homicide investigation on April 16, 2013, and first spoke with the defendant that same day. The defendant said he had gone to the victim's residence on the evening of April 15; and, among his reasons for doing so "was to speak with [the victim] about trying to reach a level agreement before their court date on the coming Friday because he said it was a waste of money."

William Bruce also testified at the hearing, saying that he was the attorney who had represented the victim in her divorce action against the defendant. He received a telephone call from a member of the victim's family on April 16, 2013, telling him that she had not shown up for work that morning. Regarding the pending divorce, he said that among the motions set for the April 19 hearing were requests to allow the victim access to her son's medical records and for the defendant to undergo a mental evaluation. Previously, there had been a problem with the defendant's complying with court orders. For instance, the day that their son was to have a psychological evaluation, the defendant told the victim that he taken him to a minor emergency clinic, rather than to be evaluated, but would not allow her to have copies of the medical records from that visit. Also, the defendant cancelled a court-ordered mediation, which had been set for April 9, and the victim was seeking sanctions against him for that. She sent emails to Mr. Bruce on Friday, April 12, and Monday, April 15, telling him that she believed the defendant had broken into her home and taken her cell phone, hacked into one of her email accounts, and deleted a number of her emails, including those between Mr. Bruce and the victim. The victim wanted primary custody of both children, for she did not like the defendant's daily coming to her house to pick them up and drop them off. Mr. Bruce said he talked with the victim on, he believed, Monday, April 15, and she wanted to get a protective order against the defendant, as well as sanctions for his failing to appear at a previous court-ordered mediation.

James Dennis testified at the hearing that he was the principal at Frayser Achievement Elementary School, where the victim was employed at the time of her death. About a week or week and a half before the victim disappeared, she asked him about her taking time off to appear at a hearing regarding her divorce and child custody. She said that she was "really frustrated by the length of the process." She told Mr. Dennis that "she was scared something may happen to her and that if she was to ever come up missing that her husband did it."

Jesika Moxley testified that she had taught at Frayser Achievement Elementary

School with the victim and talked often with her. She said that about a week prior to the victim's disappearance, the victim received a voicemail from the defendant, saying that their son was ill and she needed to call the defendant. The victim played a recording of this voicemail to Ms. Moxley, who recognized the defendant's voice. When the victim returned the defendant's call, Ms. Moxley heard him admit that his and the victim's son actually was at school and say, "[W]e don't have to do this," referring to an upcoming hearing scheduled for the following week. Ms. Moxley said that "[a]bsolutely" the victim thought the court hearing date was important. The defendant further told the victim, "[M]y attorney is going to get you in court." On April 15, the day before she disappeared, the victim, while at school, had been "very nervous, very uneasy . . . upset," which was very unusual.

Melissa Smith testified that she knew the victim because they were friends from the Germantown Athletic Club, where they exercised "usually six days a week for one to three hours a night." When she returned from the athletic club on the evening of Monday, April 15, 2013, she found she had received a text message from the victim, which had been sent before the class, saying that the victim was not attending the class that evening, because "she was tired, she needed to take a nap, [and] she had not been sleeping well." The victim told Ms. Smith she had not been sleeping well because the defendant had come into her house, and "she was nervous about that." In a telephone conversation later with the victim, she told Ms. Smith that her lawyer had said the defendant was stalking her and that "she was going to be discussing that on the upcoming Friday trial."

Edward Raulerson testified that he had dated the victim in high school in 1993, and they had stayed in touch during the intervening years. Around 10:00 p.m. the evening of Monday, April 15, 2013, he received a text message from the victim, which he did not understand, and then telephoned her. She answered and "was aggravated. She had somebody there that she didn't want there. She kept saying, Chris, get out." Mr. Raulerson recognized the defendant's voice in the background. Mr. Raulerson said he told the victim to push the emergency button on her alarm system and heard the defendant continuing to say, "I need two minutes." She told Mr. Raulerson that he should call her back in two minutes, which he did. She answered, and he heard her tell the defendant, "You've had your time, now you need to leave." Finally, he heard her tell the defendant, "[W]e'll go outside," apparently because she was concerned about waking up their sleeping daughter. Mr. Raulerson heard a door open and the defendant say he was going to have surgery the next day. The victim responded that the defendant was "being over dramatic" and should leave. Mr. Raulerson then heard the defendant say, "[I]t's a matter of life and death." The victim then told Mr. Raulerson she would talk to him later and that was the last time he spoke with her.

-22-

Chastity Wamble testified that she was the property manager at the Westminster Townhomes and was acquainted with the victim and defendant, who had shared an apartment there. The victim moved out of the apartment, but the defendant continued to live there. On April 16, 2013, the victim's cousin came to the apartment office, saying the victim had not shown up for work and was missing. The defendant telephoned Ms. Wamble on Friday, April 19, 2013, to say that he would soon be making his rent payment for the apartment. The following Monday, he came to the office to get a new apartment key because the lock had been rekeyed after execution of a search warrant at the premises. He told Ms. Wamble that he had been searching for the victim but was not involved in the search by Germantown police officers. The following day, he returned to the office and told Ms. Wamble that the victim had not been found, but he was "more focused on getting his children." He wanted to retain an attorney for this purpose and was mainly focused "on that and seize her assets is what he had mentioned." At the time of the conversation, the defendant was "very non emotion[al]."

Following the hearing, the trial court concluded that the State had proven by a preponderance of the evidence that the defendant killed the victim. The court noted that among the evidence of his guilt was the fact that he "finally told the officers that he had taken [the victim] to a location and tried to burn the body, drew them a map and took them there and that's in fact where the body was found." The evidence was bolstered by the testimony that the defendant "was at the [victim's] house the night before and had at least some sort of argument about her trying to make him leave." As for the defendant's motive, the court found that both he and the victim "felt [the hearing on April 19, 2013] was going to be an extremely significant date in their proceedings" and that the defendant's "decision to make [the victim] unavailable to testify was at least in part and I'm not finding that it was the sole reason for the actions that he undertook but I think at least in part was because he did not want to have this hearing on the 19th and that's bolstered not only by his statements but by the statements of . . . Miss Wamble who said he was relieved."

As we will explain, the record supports the determination of the trial court that the defendant stalked and frightened the victim for a period of months before her murder, to such an extent that she intended to seek an order of protection. The night before the victim went missing, the defendant came, uninvited, to her residence to confront her about the upcoming court hearing and her relationship with Mr. Raulerson. When questioned by police officers about the victim's whereabouts and later her death, the defendant gave conflicting stories, which changed as police officers revealed to him additional details of their investigation. Eventually, he admitted that he was present when the victim died and disposed of her body by taking it to a secluded location and pouring gasoline on the remains, which he then set on fire. As for evidence the defendant killed the victim to prevent her testifying at the upcoming court hearing, he knew she

intended to do so and had tried to talk her out of pursuing custody of their children.

Chastity Wamble, the property manager at the defendant's apartment complex, testified that her impression of him, after the victim's disappearance, was that he was "more focused on getting his children" and seizing the victim's assets. From all of this, the trial court concluded that the State had proven, by a preponderance of the evidence, that the defendant was involved in or responsible for the victim's disappearance and, further, that his actions against her were intended, at least in part, to procure her silence at the upcoming hearing where she intended to seek full custody of their two children. The record supports this determination.

This issue is without merit.

## II.  Evidence of Defendant's Prior Physical Abuse of Victim

The defendant argues that the trial court abused its discretion in allowing evidence, under Tennessee Rule of Evidence 404(b), as to the defendant's prior bad acts, specifically the physical abuse of the victim. The State disagrees, as do we.

Tennessee Rule of Evidence 404(b) provides as follows:

Other Crimes, Wrongs, or Acts.  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

-24-

Exceptional cases where evidence of an accused's prior bad acts are admissible include those in which the evidence is introduced to prove identity, intent, motive, opportunity, or rebuttal of mistake or accident. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[7][a] (5th ed. 2011). Where the trial judge has substantially complied with procedural requirements, the standard of review for the admission of bad act evidence is abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Although several witnesses testified during the hearing on this motion, on appeal, the defendant contests only the testimony of prior bad acts from the State's witnesses, Dara Newberry and William Bruce. Accordingly, we will consider only the testimony of those two in our review of this assignment.

In brief, Ms. Newberry testified that, in January 2013, the victim told her that, during an argument in the fall of 2012, the defendant had thrown her down and choked her. The defendant argues on appeal that this testimony should not have been allowed because the witness was not present at the incident, which occurred six to eight months before the victim was killed, the witness did not later see any bruises on the victim and had not been told by the victim that she sought medical treatment or notified the Germantown Police Department regarding the incident. Similarly, Mr. Bruce testified that the victim told him, in November or December 2012, about the time the defendant had pushed her down and choked her and, about six to eight months prior to her death, when the enraged defendant, with the veins on his neck bulging out, shoved her hard after she had confronted him about an email. As to this testimony, the defendant makes a similar objection, namely, that the incident occurred six to eight months prior to the victim's death and, thus, was irrelevant. The State responds that all of this testimony was properly admitted because it showed why the victim was afraid of the defendant, put into context their relationship, and showed why the defendant did not want the victim to testify at the upcoming court hearing.

Following the hearing, the trial court explained that the testimony which the State was seeking to introduce was admissible to show a "completeness of the story," both the defendant's state of mind, as well as that of the victim. The court found that that the victim had been planning to attend and testify at the court hearing set for April 19, 2013, that the defendant knew she was going to do so, and that the hearing dealt with the custody of their children. Additionally, the court found that the defendant's conflicting statements that he was with the victim when she died and, also, that he found her body after she had hanged herself, repeatedly telling police officers that he did not know where the victim was or what had happened to her, although he later directed them to her body, resulted in the conclusion that, as to these acts, their probative value outweighed their prejudicial value and, accordingly, they were admissible.

Initially, we note that, as long as the trial court complies with the procedure set out in Tennessee Rule of Evidence 404(b), its determination "will be given great deference on appeal and will be reversed only if the trial court abused its discretion." State v. Dotson, 450 S.W.3d 1, 76-77 (Tenn. 2014). As we will explain, we conclude that the trial court did not abuse its discretion in permitting the introduction of this evidence.

In State v. Gilliland, 22 S.W.3d 266, 271-72 (Tenn. 2000), our supreme court held that the testimony questioned by this assignment of error is "offered to show contextual background need not be excluded simply for the reason that it involves evidence of prior acts," for "such evidence is often crucial to understanding the other material evidence at trial, and the absence of background evidence could have detrimental effects on the jury's comprehension of the offense in question." Here, the proof showed that the defendant had engaged in a months-long terrorizing of the victim. Already, the jury had learned of the victim's efforts to better herself by completing college and becoming a teacher, while the defendant's employment was sparse. The defendant became upset with the victim's substantial weight loss and her becoming more outgoing. Had the jury not heard of the defendant's stalking and threatening conduct toward the victim in the months preceding his killing her, an evidentiary void would have resulted. Without this evidence, the jury could not have properly weighed the defendant's shifting claims that the victim's injuries resulted from her falling and, later, that she had hanged herself. The record supports the determination of the trial court that this evidence was admissible.

This assignment is without merit.

### III. Photographs of Victim's Corpse

The defendant argues that the trial court erred in admitting into evidence three photographs of the victim's charred corpse, asserting that they were gory, inflammatory, and of no probative value. In response, the State explains why the photographs were probative of issues at the trial.

We will review the defendant's objections to the introduction of these photographs into evidence.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the

-26-

trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

The defendant objects to the introduction of three of the photographs admitted into evidence during the trial: (1) Exhibit 85, a front view of the victim's burned face; (2) Exhibit 94, a view of the right side of the victim's head and neck; and (3) Exhibit 95, the same view of the victim's head and neck but after the debris had been cleaned away.

As to Exhibit 85, Dr. Edgar Turner, a forensic dentist, identified the victim by comparing her teeth with her dental records, saying that this particular photograph showed most clearly her teeth. The trial court concluded that this photograph was admissible for Dr. Turner to explain how he determined that the body recovered at the crime scene was the same one he later examined and identified as the remains of the victim.

Exhibit 94 was a photograph of the right side of the victim's head and neck. The court found this exhibit was admissible to show, as Dr. Laboy had testified, that the victim's "neck was not broken and there were no fractures in the neck to be significant to this case." Dr. Laboy testified that Exhibit 95 showed the same area of the victim's body after it had been cleaned. He further explained that, as a result of the cleaning of the remains, he detected fractures to "the outer table or the surface of the skull," likely due to thermal injuries, as well as the superior horns. The court admitted these two photographs into evidence to assist Dr. Laboy's testimony that the victim's neck had not been broken, that she had died from asphyxiation, and that the superior horns of the thyroid cartilage were broken in a way suggesting that she died as a result of being strangled, rather than by hanging, as the defendant had claimed in one of his statements. The court explained that these photographs, while "sad," were "not particularly graphic or horrific."

We cannot conclude that the trial court abused its discretion in admitting these three photographs into evidence. Each was admitted during the testimony of an expert witness, who said that the photographs were useful in explaining his testimony and how he drew his conclusions.

This issue is without merit.

## IV. Sufficiency of the Evidence

On appeal, the defendant argues that if the inadmissible evidence is stripped from

-27-

the State's case, the remaining proof is insufficient to support his conviction for first degree murder. However, since we have determined that the defendant's various evidentiary objections are without merit, we will consider the evidence as presented during the trial.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is defined in our criminal code as an act done after the exercise of reflection and judgment. "Premeditation" means that

the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

In this matter, the State presented evidence of the defendant's months-long campaign of harassment of the victim, which became worse as she proceeded toward divorcing him and seeking custody of both children. He harbored the mistaken belief that she was having an affair with a longtime friend of hers. The last night of the victim's life, the defendant went, uninvited to her home, to confront her, apparently about the divorce and upcoming custody hearing. While the defendant admitted he was present when the victim died, he did not admit killing her, although he later bore scratches on both arms, presumably from her attempting to fight him off. The defendant then tried to avert being a suspect in the murder, by sending messages from the victim's computer, while posing as the victim, to make it appear she had decided to leave her home and disappear. He sent messages to her phone, intended to show he wanted to convince her to stay. At a gas station, he talked with the attendant, telling him of the victim's plan to leave. The defendant made contradictory statements to Germantown police officers, saying that the victim had fallen and hit her head and, later, that he had found her body after she hanged herself. He admitted taking her body to a remote location, where he set it ablaze, and gave officers directions to the location where they found her body. Medical testimony established that the victim died as a result of asphyxiation caused by manual or ligature strangulation. From all of this, we conclude that a reasonable jury could determine that the defendant killed the victim to prevent her from testifying regarding child custody at the upcoming court hearing, that he strangled her to death, and that he

-29-

undertook complicated concealment efforts to make it appear she had decided to abandon the children and disappear, later taking her body to a remote location and setting it ablaze, thus committing the first degree premeditated murder of the victim and concealment of her body.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE